FILED

2021 Mar-15  PM 02:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| RAYMOND CARR III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 2:19-cv-00721-JHE |
| | ) | |
| UNITED STATES STEEL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

In this employment action, Plaintiff Raymond Carr III ("Carr") alleges that his former employer, Defendant United States Steel Corporation ("USS"), denied him a reasonable accommodation for his disability and constructively discharged him for requesting an accommodation for his disability and filing an EEOC charge in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (Doc. 1). USS has moved for summary judgment. (Doc. 22). Carr has filed a response in opposition to the motion, (doc. 26), and USS has replied, (doc. 29). For the reasons stated below, the motion for summary judgment is **GRANTED**.

### I. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56 "mandates the entry of summary judgment, after adequate

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 16).

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

**II. Summary Judgment Facts**

Carr has suffered from chronic obstructive pulmonary disease ("COPD") since 2005. (Doc. 24-2 at 18 (65:10-11)).  COPD causes him breathing difficulties and associated respiratory problems.  (*Id.* at 19 (67:5-68:19); doc. 24-4 at 10-11).

USS operates a steel-making facility in Fairfield, Alabama commonly referred to as Fairfield Works.  (Doc. 24-1 at 3, ¶ 3).  Carr began employment at Fairfield Works in 1994.  (Doc. 24-2 at 6 (14:22-15:2)).  He worked on the "hot side" of Fairfield Works where steel is made until USS closed down the hot side and laid him off on August 23, 2015.  (*Id.* at 6-7 (14:22-15:2, 19:2-22)).

Following the layoff, at some point in 2016, Carr worked as a contractor in the "quench and tamper" area of Fairfield Works.  (Doc. 24-2 at 17-18 (59:14-21, 62:1-8)).  There, he always wore a respirator because his work environment was dusty.  (*Id.* at 17 (59:21-22)).

In early 2017, USS recalled Carr to work at the pipe mill at Fairfield Works.  (Doc. 24-2 at 9-10 (29:22-30:2)).  On March 30, 2017, after being medically cleared and completing safety classes, Carr began on-the-job training as an oiler-stamper in the "finishing and shipping" area of the pipe mill.  (*Id.* at 11-12 (34:9-39:4)).  His oiler-stamper job involved screwing caps on the threaded ends of pipes.  (*Id.* at 12-13 (40:11-42:3)).  His station in the finishing and shipping area was near a varnish pool for soaking pipes and a spray-painting station.  (*Id.* at 12-13 (40:7-10, 42:13-18)).

Fumes from the varnish pool and the spray-painting station encroached on Carr's work area and made him dizzy, disoriented, and short of breath.  (Doc. 24-2 at 12-13, 19 (40:9-10, 43:2-4, 45:10-16, 67:17-22)).  After one and a half hours on the job, he informed a union safety coordinator about his problems breathing because of the fumes.  (*Id.* at 13-14 (45:12-46:23)).

Carr informed the on-site medical center staff about his COPD.  (Doc. 24-2 at 14 (48:22)).
After testing his breathing, the medical center staff locked Carr out of the plant and instructed him
to follow up with his personal physician to provide USS with any work limitations caused by his
COPD.  (*Id.* at 14 (47:16-48:15)).

Carr had difficulty securing an appointment with his pulmonary doctor because his
appointments were automatically scheduled every six months.  (Doc. 24-2 at 14 (49:9-13)).  Even
so, Carr provided USS with a summary of a visit with his pulmonary doctor that had taken place
in February 2017.  (*Id.* at 14 (49:2-5)).  USS informed Carr that the summary was not adequate
because the company needed current information about his limitations to determine whether he
could be put back to work.  (*Id.* at 14-16 (49:5-8, 53:14-19, 54:19-55:3)).  USS also gave Carr
paperwork for him and his pulmonary doctor to complete so the company could assess Carr's
entitlement to sickness and accident benefits, which included up to two years of leave with 70%
of his base pay.  (*Id.* at 14-15 (49:23-50:5)); doc. 24-1 at 3, ¶¶ 9-10).

Carr unsuccessfully attempted to contact his pulmonary doctor several times during April
2017 to provide a letter of his limitations and complete the sickness and accident paperwork.  (Doc.
24-2 at 16 (55:4-57:15)).  On April 14, 2017, still without information about his limitations from
his doctor, Carr submitted his part of the sickness and accident paperwork to USS.  (*Id.* at 16-17
(57:11-58:7)).

During this time, Carr kept in constant contact with the USS medical center and the union
president.  (Doc. 24-2 at 17 (58:11-18)).  Carr informed them that he did not want to be placed on
sickness and accident leave, and instead wanted to be put back to work in an area away from fumes;
he suggested working as a cleaner, sweeper, or general laborer.  (*Id.* at 17 (58:11-59:12)).  Carr

4

understood that he could not return to work without a limitations letter from his doctor. (*Id.* at 15-17 (53:14-19, 54:19-55:3, 58:17-18)).

Carr finally had an appointment at the Birmingham Pulmonary Group on May 3, 2017. (Doc. 24-2 at 15 (53:7-8); doc. 24-4 at 10-17). At the appointment, a nurse practitioner completed Carr's paperwork noting his subjective symptoms preventing him from working around chemicals, fumes, dusts, and vapors. (Doc. 24-2 at 22 (79:8-17); doc. 24-4 at 10). Carr submitted the paperwork to USS on May 4, 2017. (Doc. 24-2 at 20 (72:14-20)).

On May 11, 2017, Carr met with USS managers, Shea Moses ("Moses") and Jodi Watson ("Watson"), and his union representatives to determine whether Carr could work in any area at Fairfield Works given his limitations. (Doc. 24-1 at 4, ¶¶ 12-13; doc. 24-2 at 21-22 (74:23-75:17, 77:15-17, 78:4-9, 79:20-22)). Carr testified that Watson twice said "we don't accommodate" before the meeting started. (Doc. 24-2 at 21 (77:12-17)). Watson denied saying that at her deposition. (Doc. 24-6 at 26 (97:15-18)).

At the meeting, Carr asked if he could work as a cleaner in the finishing and shipping area. (Doc. 24-1 at 4, ¶ 13). The union president asked whether Carr could work as a laborer in the quench and tamper area and suggested that Carr could wear a dust mask. (Doc. 24-1 at 4, 8-9, ¶ 13; doc. 24-1 at 22 (78:4-79:5)). But Moses informed Carr that several chemicals were used throughout the quench and tamper area. (Doc. 24-1 at 8). The people at the meeting did not discuss the effectiveness of face masks, but Carr's pulmonary doctor, Jeffrey Gardner ("Gardner"), testified that a respiratory dust mask like the N95 would protect Carr from inhaling dust and particulate matter but would "not provide much protection" from chemicals or fumes. (Doc. 24-7 at 15 (56:16-23)).

Watson followed up regarding a laborer position in the quench and tamper area and learned that no permanent position existed.  (Doc. 24-1 at 4-5, ¶¶ 14-15; doc. 24-6 at 25 (94:12-95:3)).  In fact, all laborer positions were temporary; employees worked as laborers in the quench and tamper area only on a temporary basis while being trained for a higher position in the pipe mill.  (Doc. 24-1 at 5, ¶ 15; doc. 24-6 at 25, (94:22-95:5)).  Watson apparently did not consider Carr for a temporary laborer position because she testified that all positions in the pipe mill would require exposure to chemicals and fumes.  (Doc. 24-1 at 5, ¶ 15).  Moses also testified that all positions in the pipe mill would require exposure to chemicals and fumes.  (Doc. 24-5 at 4, ¶ 10).

However, the union president, David Clark ("Clark"), told EEOC investigators that "[t]here are dozens of jobs across the plant where a worker would not be exposed to fumes and vapors," such as "Q & T jobs," "Bloom Storage," "Hot Finishing," and "Finishing."  (Doc. 26-4 at 3).  Clark also said that a laborer could be assigned to perform several tasks at the plant such as operating a fork lift or flagging vehicles in and out of the building.  (*Id.*).

On June 2, 2017, Watson informed Carr that USS had no place for him to work at the pipe mill.  (Doc. 24-2 at 25 (90:15-18)).  At that point, his options were to continue drawing sickness and accident pay or retire.  (*Id.* at 25 (90:18-20)).  He continued drawing sickness and accident pay until he retired on September 30, 2017.  (Doc. 24-2 at 29, 46 (106:10-108:22, 174:7-9)).  He testified that he retired because he "realized [he] was not going to be able to come back to work."  (*Id.* at 38 (143:23-144:1)).  He also testified, "I was at the point exhausted, I didn't want to be on sickness and accident pay, I wanted to be working.  When you are drawing S & A, you are confined.  You are not allowed to do anything but draw the money.  I knew I could get out and make better money with my trade."  (*Id.* at 30 (110:16-21)).

Carr filed a charge of discrimination with the EEOC on July 6, 2017.  (Doc. 24-4 at 21).

In it, he alleged that USS discriminated against him because of his disability by not providing him

a position in the pipe mill.  (*Id.*).  On October 2, 2018, the EEOC "determined that [Carr's] rights

were violated under the Americans with Disabilities Act of 1990, as amended, in that he was denied

a reasonable accommodation and terminated because of his disability."  (Doc. 1 at 15).  But the

EEOC could not obtain a settlement with USS and issued Carr a notice of his right to sue USS on

February 22, 2019.  (*Id.* at 12).  This timely-filed lawsuit followed.[2]

### III. Analysis

#### A. ADA Discrimination

Carr asserts a cause of action for discrimination under the ADA against USS.  (Doc. 1 at

5-8, ¶¶ 19-31).  He alleges that USS discriminated against him because he had COPD by denying

him a reasonable accommodation in the form of a position he could perform at the pipe mill.  (*Id.*

at 6-7, ¶¶ 20-27).  He contends that USS effectively terminated his employment by denying him a

reasonable accommodation.  (*Id.* at 6, ¶ 26).

Under the ADA, covered employers may not "discriminate against a qualified individual

on the basis of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and

privileges of employment."  42 U.S.C. § 12112(a).  To state an ADA discrimination claim, a

plaintiff must demonstrate that (1) he has a disability; (2) he is a qualified individual; and (3) he

was discriminated against because of his disability.  *Greenberg v. BellSouth Telecommunications,*

*Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007).  A covered employer discriminates against a disabled

---

[2] Generally, a plaintiff must file an ADA discrimination suit within 90 days of receiving notice from the EEOC of his right to sue.  *See* 42 U.S.C. § 12117(a) (incorporating the enforcement provisions of Title VII); 42 U.S.C. § 2000e-5(f)(1) (the 90-day filing requirement found in Title VII).  Carr filed this lawsuit on May 10, 2019, which is within 90 days of February 22, 2019.

employee by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ."  42 U.S.C. § 12112(b)(5)(A).  The burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply to ADA discrimination claims based on a failure to provide a reasonable accommodation because "an employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA."  *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007) (emphasis in original).

Under the first element of an ADA discrimination claim, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual; [] a record of such an impairment; or [] being regarded as having such an impairment." 42 U.S.C. § 12102(1).  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The amended ADA's implementing regulations provide that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.  'Substantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2(j)(1)(i).  And the Eleventh Circuit has stated, "When making the 'substantially limits' determination, we consider the manner in which the individual is limited in the activity as compared to the general population, and may consider the difficulty, effort, or time required to perform a major life activity as well as the length of time for which the individual can perform the activity and the pain experienced."  *Hudson v. Tyson Farms, Inc.*, 769 F. App'x 911, 916 (11th Cir. 2019) (citing *Mullins v. Crowell*, 228 F.3d 1305, 1314 (11th Cir. 2000)).

Here, Carr asserts that his COPD is a disability under the ADA because his condition substantially limits his ability to work and breathe. (Doc. 26 at 11-13). The undersigned disagrees. "An impairment does not substantially limit the ability to work merely because it prevents a person from performing either a particular specialized job or a narrow range of jobs." *Hudson*, 769 F. App'x at 916 (citing *Rossbach v. City of Miami*, 371 F.3d 1354, 1359 (11th Cir. 2004)). Carr's COPD prevented him from working around chemicals or fumes at Fairfield Works, which is only a narrow range of jobs. Also, Carr has worked several contractor jobs since retiring from USS in September 2017, including jobs at the American Cast Iron Pipe Company and a Tennessee Valley Authority nuclear facility. (Doc. 24-2 at 48 (182:8-19)). Consequently, the record does not support a substantial limitation on the major life activity of working.

The record also does not support Carr has a substantial limitation in breathing. Records of the Birmingham Pulmonary Group's treatment of Carr's COPD from 2005 to 2019 consistently show that Carr experienced intermittent episodes of moderate breathing difficulties and bronchitis exacerbated by exposure to particulates that he successfully treated with an inhaler. (*See* doc. 24-7 at 4-12 (12:16-43:23)). 2017 was no different. The Birmingham Pulmonary Group noted in February 2017 that Carr's COPD was stable, and he had not experienced a recent episode. (*Id.* at 6-7 (19:15-21:4)). The record of Carr's appointment on May 3, 2017 states that he rated the severity of his symptoms as 3 out of 10, reported aggravation from smoke, dust, vapors, moderate to strenuous activity, upper respiratory infection, and workplace exposures, relieved his symptoms by exposure to fresh air and using his inhaler, and reported symptoms only of dyspnea with exertion and wheezing. (Doc. 24-4 at 10). A note from the same appointment states, "He had an episode of acute bronchitis in April but is otherwise doing very well. He is very active and only requires his [inhaler] one to two times during the day. He can return to work but should avoid

inhalation of chemicals, perfumes, cigarette smoke, dust, and vapors." (Doc. 24-7 at 10 (34:13-22)). And, in August 2017, Carr reported having no exacerbations since May 2017 and the Birmingham Pulmonary Group again recommended avoiding chemicals, perfumes, cigarette smoke, and vapors. (*Id.* at 10 (34:23-35:21)).

The medical evidence shows that Carr had major difficulties breathing around chemicals and fumes. But "breathing around chemicals and fumes" is not a major life activity under the ADA; just "breathing" is. Under normal conditions, Carr could breathe with only rare and intermittent episodes of moderate difficulties that he successfully treated with an inhaler. Even under the amended ADA's more lenient standard, Carr lacks evidence that his COPD substantially limited his ability to breathe. As such, there is no genuine issue of material fact as to whether Carr had a disability under the ADA.

Moreover, Carr has failed to show a genuine dispute of material fact as to the "qualified individual" element of his ADA discrimination claim. The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Accordingly, an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that . . . that he can perform the essential functions of his job with a reasonable accommodation . . . . An accommodation is reasonable and necessary under the ADA, in turn, only if it enables the employee to perform the essential functions of the job." *Holly*, 492 F.3d at 1256 (internal quotation marks and citations omitted). According to the amended ADA's implementing regulations, "[t]he term reasonable accommodation means . . . [m]odifications or adjustments to the work environment . . . that enable an individual

with a disability who is qualified to perform the essential functions of that position," and may include job restructuring or reassignment to a vacant position.  29 C.F.R. § 1630.2(o)(1)-(2).

Here, the parties do not dispute that Carr could not perform the essential functions of any position in the pipe mill that required exposure to chemicals, fumes, vapors, and smoke.  (*See* doc. 23 at 6, 11, ¶¶ 25, 51; doc. 26 at 3, 7, ¶¶ 25, 51).  And, for the reasons explained below, no evidence capable of creating a genuine dispute of material fact shows that any positions existed in the pipe mill that were *not* exposed to chemicals, fumes, vapors, or smoke for which Carr was qualified.

Carr argues otherwise for several reasons.  First, he points to statements made by Clark, a maintenance utility worker at USS and the local union president with personal knowledge of the Fairfield Works work environment.  (Doc. 26 at 6, 14).  Clark told EEOC investigators that "[t]here are dozens of jobs across the plant where a worker would not be exposed to fumes and vapors," such as "Q & T jobs," "Bloom Storage," "Hot Finishing," and "Finishing," and that a laborer could be assigned to perform several tasks at the plant such as operating a fork lift or flagging vehicles in and out of the building.[3]  (Doc. 26-4 at 3).  Clark's statements do not create a genuine dispute of material fact.  No evidence shows that USS had any open vacancies for the positions mentioned by Clark.  Next, putting aside for now the quench and tamper jobs, no evidence describes the work environment or duties of "bloom storage," "hot finishing," and "finishing" jobs.  Carr did not testify that he had previously worked in "bloom storage," "hot finishing," and "finishing."

---

[3] USS contends that the Court must disregard Clark's statements recorded on EEOC interview notes as hearsay within hearsay.  (Doc. 29 at 4).  The undersigned disagrees.  "[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).  "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."  *Id.*  Carr could reduce Clark's statements to admissible form and avoid a hearsay objection at trial by calling Clark as a witness, so the Court will consider Clark's statements on summary judgment.

Although a reasonable jury could credit Clark's statements that those jobs were not exposed to chemicals, fumes, vapors, or dust, a jury could only speculate as to whether Carr, with or without reasonable accommodation, could perform the essential functions of those jobs because no evidence exists of those essential functions.  And to the extent that "hot finishing" and "finishing" refers to the finishing and shipping area at the pipe mill, Carr could not work in the finishing and shipping area where chemicals and fumes exacerbated his COPD in the first place.

On the other hand, Carr *had* worked in the quench and tamper area in 2016 wearing a dust mask without issue.  (Doc. 24-2 at 17-18 (59:14-22, 62:1-8)).  And Carr testified that the quench and tamper area was not exposed to chemicals, fumes, vapors, and dust.  (Doc. 24-2 at 13 (44:2-6); doc. 26-4 at 3).  At first glance, it might appear that USS could have accommodated Carr by reassigning him to a temporary laborer position in the quench and tamper area.[4]  But other evidence precludes such an inference.  Moses testified that "[r]efractory work is performed in the Pipe Mill around the Quench & Tamper area, the AF furnace, and the TF furnace during an outage or when the equipment is shut down . . . When there is not an outage in those areas, the same or similar chemicals, fumes, smoke and vapors would be present . . . ."  (Doc. 24-5 at 5, ¶¶ 19-20).  This testimony is not disputed.  And Carr confirmed at his deposition that he worked in the quench and tamper area only during an outage:

---

[4] A temporary position would have been the only workable option because no permanent positions existed in the quench and tamper area.  (*See do*c. 24-1 at 4-5, ¶¶ 14-15; doc. 24-6 at 25 (94:12-95:5)).  Transforming a temporary position into a permanent position is generally not a reasonable accommodation.  *See Skotnicki v. Bd. of Trustees of The Univ. of Alabama*, 2014 WL 3891973, at *11 (N.D. Ala. Aug. 8, 2014) ("The initial accommodation sought by Plaintiff—transforming her temporary assignment in the interventional cardiology office into a permanent position—was not reasonable."), *aff'd*, 631 F. App'x 896 (11th Cir. 2015); *Richardson v. Honda Mfg. of Ala., LLC*, 635 F. Supp. 2d 1261, 1280 (N.D. Ala. 2009) (finding that the ADA does not require an employer to "convert a temporary job into a permanent one") (quoting *Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1492 (M.D. Ala. 1994)).

Q. Okay. And when you were working as a contractor in the pipe mill, were you putting refractory material inside some type of furnace?

A. What they call a quench and temper furnace, they have got what they call the AF furnace, they have got what they call the two reheat furnaces which is the building north of those areas and it's insulation brickwork, the fiber called kaowool, that was all I ever did . . . .

Q. Okay. And when you were doing this work on these furnaces, it was during what you called an outage?

A. That is what they call them.

Q. Okay. And an outage, does that basically mean the furnace is not working or turned on?

A. It was done for repairs.

Q. Okay. It would have to be I guess an outage because otherwise it would be hot and you couldn't survive in there?

A. Correct.

(Doc. 24-2 at 17-18 (61:21-62:20)). No evidence suggests that there was an outage in any furnace in 2017 that would have permitted Carr to work around the quench and tamper area, the AF furnace, or the TF furnace. So Carr's argument that USS could have accommodated him by reassigning him to "refractory work in Quench and Tamper, AF Furnace, and the Tube Reheat[5] area where no fumes were present" fails. (*See* doc. 26 at 14).

Next, Carr argues that USS could have reassigned him to work as a cleaner as he requested. (Doc. 26 at 15; *see* doc. 24-1 at 4, ¶ 13; doc. 24-2 at 17 (58:11-59:12)). Carr is incorrect.

---

[5] Carr mentioned "Tube Reheat" in passing at his deposition, (doc. 24-2 at 13, 34, 47 (44:5, 128:8, 180:13-14)), and in his response to USS's motion for summary judgment, (doc. 26 at 5-6, 14). But the record contains no evidence explaining "Tube Reheat." Carr appears to have referred to "Tube Reheat" as a furnace at his deposition, (doc. 24-2 at 47 (180:13-14)), and, tracking Moses's testimony, "Tube Reheat" might be synonymous with "TF Furnace," (doc. 24-5 at 5, ¶ 19). Either way, Carr's suggestion that he could work "Tube Reheat" does not raise a genuine dispute of material fact.

Undisputed testimony from Watson and Moses shows that USS contracted out all of its janitorial jobs.  (Doc. 24-1 at 5, ¶ 20; Doc. 24-5, at 4, ¶ 14).  USS does hire its own maintenance employees, (doc. 24-6 at 20 (73:9-74:11)), but Carr had not taken the required test to qualify for a maintenance position, (*id.* at 20 (73:15-74:11)).  Even if USS administered the qualification test to Carr while he was on sickness and accident leave, which he never requested, no evidence capable of creating a genuine dispute of material fact points to any area in which Carr could work away from chemicals, fumes, vapors, and dust for the reasons explained above.

Carr also contends that he could have worked as a railcar loader near the finishing and shipping area.  (Doc. 26 at 7, ¶ 50; *see* doc. 24-2 at 22 (81:10-17)).  But USS had no open vacancies for the railcar loader position.  (Doc. 24-5 at 4, ¶ 16).  Moreover, Carr testified that railcar loaders would experience "some overspray" of chemicals from the finishing and shipping area that he could not tolerate, (doc. 24-2 at 23 (82:2-6)), and Moses testified that railcar loaders are exposed to chemicals that Carr could not tolerate, (doc. 24-5 at 4, ¶ 18).  Although Carr also testified that "from what [he] could tell the vapors and fumes were contained in [the finishing and shipping] area," (doc. 24-2 at 22 (81:15-16)), he had never actually worked in the railcar loaders' area, (*id.* at 23 (82:3-5)), and no evidence refutes Moses's testimony that railcar loaders still would have to work inside the finishing and shipping area, (doc. 24-5 at 4, ¶ 17).  Additionally, Carr has not attempted to explain how USS possibly could have restructured the railcar loader job—which, again, had no open vacancy—to accommodate his limitations.  Carr has not established a genuine dispute of material fact as to whether he was a qualified individual with respect to a railcar loader position.

Next, Carr appears to suggest that he could have performed the essential functions of his oiler-stamper job with the reasonable accommodation of an operational fan in the finishing and

shipping area. (Doc. 26 at 2-3, ¶ 22). The finishing and shipping area contained a fan and, according to Carr, "[t]he location of the fan and the undisputed presence of fumes in that area suggest that the fan was there for purposes of removing noxious fumes and ventilating the workspace," but the fan might not have been working on the day that Carr worked in the finishing and shipping area. (*Id.* at 2-3, ¶ 22). Even accepting as true Carr's opinion that the mere presence of a fan in an area with fumes supports a reasonable inference that the fan's purpose is to remove fumes, his argument misses the mark. There is no evidence to show whether the fan in the shipping and finishing area, or any fan, would have successfully removed noxious fumes from Carr's workspace. A jury could only speculate as to whether a fan would have been a reasonable accommodation permitting Carr to return to work, and speculation cannot defeat summary judgment.

Finally, Carr appears to suggest that he could have performed the essential functions of some jobs with the reasonable accommodation of wearing a respiratory dust mask. (Doc. 26 at 5, ¶ 41). But Carr's pulmonary doctor testified that a respiratory dust mask like the N95 would "not provide much protection" from chemicals or fumes. (Doc. 24-7 at 15 (56:16-23)). USS asked Carr's doctor in August 2017 whether Carr could work for 12 hours wearing a respirator because it "appear[ed] to be the only way that he would be able to work in his requested area given the current restrictions of: Avoid inhalation of chemicals, perfumes, cigarette smoke, dusts and vapors," but USS never received a response even after following up. (Doc. 24-4 at 20; doc. 24-8 at 3, ¶¶ 6-7). Thus, no evidence exists as to whether Carr could perform the essential functions of any job by wearing a respiratory dust mask.

In sum, the record does not contain any evidence of a job that Carr, with or without a reasonable accommodation, could perform at Fairfield Works because of his COPD. Therefore,

there is no genuine dispute of material fact as to whether Carr was a qualified individual under the ADA and USS is entitled to summary judgment on his discrimination claim.

### B. Retaliation

Carr asserts a cause of action for retaliation under the ADA against USS.  (Doc. 1 at 8-9).  He alleges in his complaint, "Plaintiff has not been rehired into his previous position or any position in retaliation for opposing Defendant's act of refusing to reasonably accommodate Plaintiff."  (*Id.* at 8, ¶ 34).  He contends in his response to the motion for summary judgment that USS retaliated against him for requesting an accommodation by constructively discharging him.  (*See* doc. 26 at 18-20).  USS contends that Carr's retaliation claim fails because he did not exhaust his administrative remedies for that claim.  (Doc. 23 at 28-29).  For the following reasons, the Court disagrees.

A plaintiff must file an administrative charge with the EEOC before filing an ADA retaliation claim in court.  *See Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004) (discussing the requirement of filing an EEOC charge before bringing suit for retaliation under Title VII); 42 U.S.C. § 12117(a) (ADA incorporating the enforcement provisions of Title VII).  A "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Id.* at 1280 (quotation omitted).  Accordingly, "allegations of new acts of discrimination"—*i.e.*, those not raised in a prior EEOC charge—"are inappropriate" for a judicial complaint.  *Id.* at 1279-80.

However, courts are "extremely reluctant to allow procedural technicalities to bar claims" requiring administrative exhaustion.  *Gregory*, 355 F.3d at 1280 (quotation omitted).  The Eleventh Circuit has cautioned that "the scope of an EEOC complaint should not be strictly interpreted."  *Id.*  Accordingly, a plaintiff does not need to exhaust his administrative remedies before filing a retaliation claim in court if the retaliation claim "gr[e]w out of the original charge of

16

discrimination" because "the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (quoting *Gupta v. E. Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981)).[6]

In *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889 (11th Cir. 2014), the Eleventh Circuit explained when claims not raised in a prior EEOC charge are nevertheless properly before a court.[7] In doing so, the Eleventh Circuit compared the facts of *Duble* with the facts of two leading cases on the matter, *Gupta* and *Baker*. *See Duble*, 572 F. App'x at 892-93.

In *Gupta*, the plaintiff brought claims in court arising out of prior EEOC charges. While his lawsuit was pending, his employer notified him that his employment contract would not be renewed the following year. The plaintiff then alleged in his lawsuit that the nonrenewal was unlawful retaliation for filing his prior EEOC charges, but he did not file a new EEOC charge alleging retaliation. Nevertheless, the Fifth Circuit found that the plaintiff did not have to exhaust his administrative remedies for the retaliation claim because the retaliation claim grew out of the filing of EEOC charges that were properly before the court. *Gupta*, 654 F.2d at 414.

Similarly, in *Baker*, the plaintiff filed suit after receiving a right to sue letter from the EEOC. While her lawsuit was pending, she filed a motion for preliminary injunction seeking to enjoin her employer from taking acts allegedly in retaliation for her filing suit. Although the plaintiff did not file a new EEOC charge alleging retaliation, the Eleventh Circuit found that she

---

[6] The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[7] In its reply brief, USS asserts that *Duble* "is binding on this Court," (doc. 29 at 6), but the Eleventh Circuit provides by rule that unpublished decisions are not binding authority. Eleventh Circuit Rules, Rule 36-2. Nevertheless, the undersigned finds *Duble* persuasive to the extent it accurately states the law regarding exhaustion.

did not have to exhaust her administrative remedies for her retaliation claim because "a claim of retaliation could reasonably be expected to grow out of the original charge of discrimination"; that original charge of discrimination was already properly before the court. *Baker*, 856 F.2d at 169.

In contrast, the plaintiff in *Duble* filed an EEOC charge alleging discrimination under the ADA for his employer's failure to reasonably accommodate his disability. While the EEOC investigation was pending, the plaintiff's employer terminated him for allegedly violating company email policy. Two years later, he filed suit alleging that his employer discriminated against him by failing to reasonably accommodate his disability and terminated him in retaliation for seeking a reasonable accommodation. The plaintiff never filed a second EEOC charge alleging retaliation. The Eleventh Circuit found that the plaintiff failed to exhaust his administrative remedies for his retaliation claim. *Duble*, 572 F. App'x at 893. Unlike the plaintiffs in *Gupta* and *Baker*, the plaintiff in *Duble*'s retaliation claim "relate[d] to a discrete act of alleged discrimination that occurred after he filed his initial charge"; *i.e.*, he did not allege retaliation for filing an EEOC charge or a lawsuit properly before the court, and instead alleged an unrelated act of retaliation. *Id.*

Here, Carr alleges that USS retaliated against him for "opposing Defendant's act of refusing to reasonably accommodate Plaintiff," (doc. 1 at 8, ¶ 34), and he did in fact oppose USS's alleged failure to accommodate his disability by filing his EEOC charge. So, like the plaintiffs in *Gupta* and *Baker*, Carr's retaliation claim grows out of his EEOC charge. Moreover, although Carr left USS after filing his EEOC charge and he did not amend the charge to add a retaliation claim, his departure from the company was clearly within the scope of the EEOC's investigation. (*See* doc. 1 at 15) (EEOC finding that Carr was "terminated because of his disability"). And, unlike the difference between failing to accommodate an employee's disability and terminating

18

her for violating company email policy, as was the case in *Duble*, there is only a small difference between failing to accommodate an employee's disability and terminating an employee for requesting a reasonable accommodation, as Carr alleges was the case here.  Therefore, the undersigned does not consider the alleged retaliation for requesting a reasonable accommodation to be such a new or discrete act of discrimination requiring a separate EEOC charge.  Carr did not need to exhaust his administrative remedies for his retaliation claim, and that claim is properly before the Court.

However, the claim fails on its merits.  A successful retaliation claim requires proof of three elements: (1) the plaintiff engaged in statutorily protected activity; (2) the plaintiff suffered an adverse employment action; and (3) the adverse action was causally related to the plaintiff's protected activities.  *Gregory*, 355 F.3d at 1279.  Carr fails to satisfy at least the second element.

Under the second element of a retaliation claim, a constructive discharge is an adverse employment action.  *Bryant v. Jones*, 575 F.3d 1281, 1298-99 (11th Cir. 2009).  A "[c]onstructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job."  *Id.* at 1298 (quotation omitted).  To prove a constructive discharge, "[a] plaintiff must show the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign."  *Id.* (quotation omitted).

Here, Carr contends that he was constructively discharged because USS's failure to provide him a reasonable accommodation forced him to retire.  (Doc. 26 at 19).  But, as explained above in the context of Carr's ADA discrimination claim, the record lacks evidence of any reasonable accommodation that could have permitted Carr to return to work.  As such, this is not a case of an employer "deliberately mak[ing] an employee's working conditions intolerable."  *See Bryant*, 575

F.3d at 1298.  Rather, this is a case of an employee's health making it impossible for him to work.  Moreover, USS paid Carr 70% of his regular pay as sickness and accident benefits while he was not working, which is a benefit intended to retain employees as opposed to an unbearable condition that would compel a reasonable person to resign.  Carr did not resign to escape intolerable working conditions; instead, he voluntarily resigned so he could, in his own words, "make better money" elsewhere.  (Doc. 24-2 at 30 (110:21)).

Finally, to the extent Carr argues Watson's alleged statement that "we don't accommodate" means USS failed to even seek out a possible accommodation, and thus that he suffered an adverse employment action, that argument fails.  Even taking as true that Watson made the statement, the evidence as set out above in the context of Carr's ADA discrimination claim shows that USS did, at least to some extent, try to find an accommodation for Carr, but a reasonable accommodation simply did not exist.  A reasonable jury could not draw the conclusion from Watson's statement that USS failed to make efforts to accommodate Carr—and thus find a causal connection between Carr's search for accommodation and his discharge—when the evidence supports that USS did make some efforts, but no such reasonable accommodation was possible.

Because Carr lacks any evidence that he suffered an adverse employment action, USS is entitled to summary judgment on his retaliation claim.

## IV. Conclusion

For the reasons stated above, the undersigned finds there is no genuine issue of material fact, and USS is entitled to judgment as a matter of law.  USS's motion for summary judgment, (doc. 22), is **GRANTED**.  A separate order will be entered.

DONE this 15th day of March, 2021.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE